

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00075-CV

| | | |
|---|---|---|
| In the Interest of D.R.J. and T.F.J., Children | § | From the 323rd District Court |
| | § | of Tarrant County (323-90797J-09) |
| | § | February 7, 2013 |
| | § | Opinion by Justice Meier |
| | § | Concurrence by Justice Gardner |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's order. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

By_____
Justice Bill Meier



IN THE INTEREST OF D.R.J. AND
T.F.J., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

**OPINION**

----------

In a single issue, Appellant J.J. appeals the trial court's order terminating her parental rights to her children, D.R.J. and T.F.J. We will affirm.

CPS received a referral on June 1, 2009, involving concerns of sexual abuse of J.J., her sister M.J., and her twin cousins L.J.1 and L.J.2 by J.J.'s and M.J.'s brother K.M. At the time of the referral, all were members of the same household with C.J.—J.J.'s, M.J.'s, and K.M.'s mother. This was the sixth referral involving C.J.'s home since April 2007. CPS had received a referral then involving neglectful supervision of J.J. by C.J. because J.J. was fourteen years old and pregnant. CPS received a second referral in January 2008 involving

sexual abuse of J.J., M.J., L.J.1, and L.J.2 by K.M. CPS received a third referral in June 2008 involving neglectful supervision of J.J. by C.J. because J.J. was pregnant with her second child. CPS received a fourth referral in August 2008 involving sexual abuse of L.J.1 by K.M. And in January 2009, CPS received a fifth referral involving sexual abuse of L.J.1 and L.J.2. Each of the first five referrals were either closed at intake, closed administratively, or ruled out.

CPS investigator Beth Hobbs met with J.J. on two occasions to discuss the latest referral. At the first meeting, J.J. was in juvenile detention for evading arrest after an altercation with C.J. C.J. had whipped J.J. with a two- to three-foot board and a weapon, and J.J. had grabbed a knife and threatened C.J. before jumping out of a two-story window onto C.J.'s car. Hobbs concluded the interview quickly because J.J. was uncommunicative. At the second meeting, J.J. expressed that she had no concerns about her children, including having them in her mother's care, and she was unwilling to speak about whether K.M. was the father of her two children. Hobbs also spoke with C.J., who was unwilling to work with CPS. Concerned about (1) the ongoing sexual relationship between J.J. and K.M., which C.J. appeared to be aware of, and (2) D.R.J. and T.F.J. being at risk for sexual abuse by K.M. like J.J., M.J., L.J.1, and L.J.2, CPS removed D.R.J., and T.F.J. (and J.J., M.J., L.J.1, and L.J.2) from C.J.'s household. All of the children were placed into foster care.

J.J. moved between foster homes from June 2009 to September 2010. At one point, D.R.J. and T.F.J. lived with J.J. at a foster home, and DFPS felt that

3

J.J. had moved closer towards complete reunification with her children. However, J.J.'s behavior, including an incident in which she threw water from a microwave that hit T.F.J., concerned the foster parent, and J.J. was ultimately removed from the foster home and admitted to a psychiatric hospital. After being released from the hospital, J.J. demanded to be returned to her mother's care. Concerned that J.J. returning to C.J.'s household would "set [J.J.] back tremendously," DFPS opposed her request, but she was ultimately permitted to live with C.J.

J.J. successfully performed only some of the services that the trial court ordered her to complete to obtain the return of D.R.J. and T.F.J. At some point, DFPS's plan for J.J. regarding D.R.J., and T.F.J. changed from reunification to termination.

J.J. testified at trial that K.M. had sexually abused her, M.J., L.J.1, and L.J.2; that K.M. began sexually abusing her when she was twelve years old; that K.M. continued to sexually abuse her until she was placed into foster care; and that K.M. is the father of her two children. J.J. explained that she moved back to C.J.'s household despite realizing that she "wouldn't be able to get [her] kids" back, and she acknowledged squandering numerous opportunities for counseling and family therapy. The jury found by clear and convincing evidence that termination of the parent-child relationship between J.J. and D.R.J. and T.F.J. was proper under family code section 161.001(1)(O) and that termination was in the children's best interests.

4

In her only issue, J.J. challenges the legal and factual sufficiency of the evidence to support the jury's findings that D.R.J. and T.F.J. were removed from J.J.'s care due to abuse or neglect by her against each of the children.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001 (West Supp. 2012), § 161.206(a) (West 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.,* 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated section 161.001(1) and that termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann.

5

§ 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

Termination of the parent-child relationship is warranted under family code section 161.001(1)(O) if the parent has

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months *as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child*.

Tex. Fam. Code Ann. § 161.001(1)(O) (emphasis added).

As alluded to above, J.J. does not challenge the sufficiency of the evidence to show that she failed to comply with the provisions of the order that established the actions necessary for her to obtain the return of the children or that the children had been in the conservatorship of DFPS for at least nine months. Instead, she argues that while there is evidence that she, M.J., L.J.1, and L.J.2 were sexually abused by K.M., there is no evidence or insufficient evidence that D.R.J. and T.F.J. were removed from her care because (1) *they* were abused or neglected (2) by *her*. J.J.'s arguments are unpersuasive.

Applying well-established rules of statutory construction, subsection (O) does not require that the parent who failed to comply with a court order be the same person whose abuse or neglect of the child warranted the child's removal.

6

*See In re S.N.*, 287 S.W.3d 183, 188 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("Had the legislature intended such a requirement, it could have easily provided that conservatorship be 'as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child *by the parent.*'"); *In re M.N.*, No. 11-10-00129-CV, 2011 WL 917837, at *3 (Tex. App.—Eastland Mar. 17, 2011, no pet.) (mem. op.) (reasoning similarly). Thus, notwithstanding our reasoning below attributing abuse and neglect of D.R.J. and T.F.J. to J.J., DFPS did not have to prove that the abuse or neglect of D.R.J. and T.F.J. was caused by J.J.

As for the "abuse or neglect" prong of subsection (O), several appellate courts have observed that "abuse or neglect" is not defined in the statute or by the case law and must be determined on a case-by-case basis. *See In re A.A.A.*, 265 S.W.3d 507, 515 (Tex. App.—Houston [1st Dist.] 2008, pet. denied); *see also In re J.T.G.*, No. 14-10-00972-CV, 2012 WL 171012, at *14 (Tex. App.—Houston [14th Dist.] Jan. 19, 2012, pet. denied) (mem. op.). We agree with that assessment.

Here, J.J. testified that K.M., her own brother, began sexually abusing her at age twelve and continued to do so until she—and her two children fathered by K.M.—were removed from C.J.'s household. K.M., whom J.J. described at trial as a "predator," also sexually abused M.J., his other sister, and L.J.1 and L.J.2, his cousins. Thus, K.M., who had at one point been sent to juvenile detention for sexual assault, had sexually abused almost every child in C.J.'s residence.

7

When Hobbs questioned J.J. after the sixth referral, J.J. expressed no concern about leaving her children in C.J.'s household. Further, it appeared to Hobbs that C.J. was aware of K.M.'s incestuous sexual abuse, but there is no evidence that she took steps to confront the situation. The conservatorship worker assigned to the case testified that there are "several" options available to a thirteen year old who has a child and wants to move the child out of the house.

The evidence of J.J.'s lack of concern about leaving D.R.J. and T.F.J. in the same environment where K.M. was sexually abusing other family members was sufficient to show neglectful supervision of D.R.J. and T.F.J. by J.J. Moreover, the undisputed evidence of ongoing sexual abuse of multiple family members occurring in the same household where D.R.J. and T.F.J. lived was sufficient to demonstrate emotional abuse of D.R.J. and T.F.J. while in J.J.'s care. Accordingly, we hold that the evidence is legally and factually sufficient to support the jury's family code section 161.001(1)(O) findings. *See* Tex. Fam. Code Ann. § 161.001(1)(O). We overrule J.J.'s only issue and affirm the trial court's order terminating J.J.'s parental rights to D.R.J. and T.F.J.

BILL MEIER
JUSTICE

PANEL: GARDNER, MCCOY, and MEIER, JJ.

GARDNER, J., filed a concurring opinion.

DELIVERED: February 7, 2013

8



# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-12-00075-CV

IN THE INTEREST OF D.R.J. AND
T.F.J., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## CONCURRING OPINION

----------

I cannot agree that there was evidence of "abuse or neglect" by J.J. of her two children that resulted in their removal by the Department. From my review of the record, removal was due to neglect of J.J.'s children by C.J., J.J.'s mother, not by J.J. Because I agree with the majority that, for termination of parental rights under section 161.001(1)(O), the parent whose parental rights are sought to be terminated need not be the same person whose "abuse and neglect" resulted in the child's removal and because I believe that the evidence is clear

and convincing that the children were removed because of neglectful supervision by C.J., I concur in the affirmance of the trial court's judgment.

The "abuse or neglect" resulting in removal of children by the Department need not have been committed by the parent whose rights are sought to be terminated under subsection (O). *See In re S.N.*, 287 S.W.3d 183, 185–86 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (op. on reh'g) (affirming termination of father's rights under subsection (O) although children had been removed from mother, not father, and concluding that "subsection (O) does not require that the parent who failed to comply with a court order be the same parent whose abuse or neglect . . . warranted the child's removal"); *In re C.D.B.*, 218 S.W.3d 308, 309–12 (Tex. App.—Dallas 2007, no pet.) (upholding termination of mother's rights for failure to comply with order establishing actions necessary for return of children who had been removed for father's abuse of children during mother's absence); *In re S.M.*, No. 04-04-00194-CV, 2005 WL 418540, at *1–4 (Tex. App.—San Antonio Feb. 23, 2005, no pet.) (mem. op.) (affirming termination of mother's rights for failure to comply with court order under subsection (O) for return of children removed as a result of her boyfriend's abuse of one of the children); *see also In re C.M.C.*, No. 14-12-00186-CV, 2012 WL 3871359, at *1, 4 (Tex. App.—Houston [14th Dist.] Aug. 30, 2012, no pet.) (mem. op) (op. on reh'g) (affirming termination of father's rights for failure to comply with court order under subsection (O) for return of children whose removal was the result of abuse or neglect by mother); *In re M.N.*, No. 11-10-00129-CV, 2011 WL 917837,

2

at *3 (Tex. App.—Eastland Mar. 17, 2011, no pet.) (mem. op.) (holding removal of children for neglectful supervision of child by mother sufficed for termination of father's parental rights under subsection (O) for failure to comply with service plan as required to obtain return of children).

Here, the evidence—ranging from the history of prior referrals and from the investigation at the time of the removal—was undisputed that physical abuse and neglectful supervision of J.J., her sister, and her two children had been ongoing by C.J. for several years; C.J. had ignored, if not allowed, the sexual abuse of all of the children in the household by K.M. As the majority notes, it appeared that C.J. knew of K.M's ongoing incestuous behavior, but C.J. took no steps to confront it, was unwilling to discuss it, and did not cooperate with the Department. This evidence was sufficient to constitute clear and convincing evidence in this case for removal of the children for neglectful supervision by C.J. under subsection (O) without faulting J.J., who was herself a victim and still only sixteen at the time she, her sister, her cousins, and her children were finally removed from C.J.'s home. The evidence of removal for neglectful supervision by C.J. also harmonizes the jury's affirmative finding in answer to the termination questions based on (O) with the jury's refusal to find that J.J. either knowingly placed or knowingly allowed her children to remain in conditions or surroundings which endangered their emotional or physical well-being under family code section 161.001(1)(D) or that J.J. engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered her children's

3

physical or emotional well-being under section 161.001(1)(E). *See* Tex. Fam. Code Ann. § 161.001(D), (E), (O) (West Supp. 2012).

Beth Hobbs was the CPS investigator assigned to the June 1, 2009 referral relating to C.J. as a result of concerns about K.M.'s sexual abuse of J.J., age sixteen; M.J., age thirteen; and J.J.'s twin cousins, age twelve, all of whom were living in C.J.'s household. Prior referrals began in April 2007 with an allegation of neglectful supervision by C.J. because J.J. was fourteen years old and pregnant. The January 30, 2008 referral involved allegations of physical abuse by C.J. and K.M., who had recently moved back in the home, and sexual abuse by K.M. of another cousin. A June 23, 2008 referral alleged neglectful supervision of J.J. by C.J. because J.J., then the mother of a ten-month old child, was pregnant again. Those cases were closed because no child made an outcry of sexual abuse to the Department, but J.J. was admitted to and received treatment from the adolescent psychiatric floor for suicidal ideations. Yet another referral was made in August 2008 alleging sexual abuse of one of the cousins by K.M., who had been in the Detention Center but was then back in the home. That case was closed in part because the juvenile system was working with the family. Before this case, the most recent referral was for alleged sexual abuse of the cousins by K.M., who admitted that he had "hunched" one of the cousins, had penetrated her anus between twenty and thirty times, and had performed oral sex on the other cousin.

The June 1, 2009 referral that Hobbs received for this case was for sexual abuse not only of M.J. and the cousins but also of J.J.'s two children. A report then came in that J.J.'s children were fathered by her brother. Hobbs attended J.J.'s detention hearing; interviewed the four older children; and spoke with C.J., her boyfriend, and a family friend and godparent to one of J.J.'s children who was a possible placement option for J.J. or M.J. Hobbs presented a request to the District Attorney's office for removal of all of the children on June 5, 2009, pursuant to section 262.104 of the family code, which allows for emergency removal of children without a court order. *See* Tex. Fam. Code Ann. § 262.104 (West 2008).

Respectfully, I believe that the majority's reference to a "lack of concern" by J.J. about leaving her children in her mother's care does not fairly characterize Hobbs's testimony. Hobbs testified that she first tried to interview J.J. at the Juvenile Detention Center on the date of the referral. This was a child who had been beaten with a board by her mother the night before while her brother held her down and joined in the beating until she escaped by jumping from a second-story window. Hobbs said J.J. was "very quiet"; sat with her hands on her face; only answered "a fight" as to why she was at the Detention Center; and responded "yes," "no," or with no answer at all to other questions. Hobbs testified that J.J. "just really wasn't communicative." When Hobbs expressed concern for the children's safety in light of allegations that her brother was their

5

father and that she had been the victim of ongoing sexual abuse, Hobbs said, J.J. "was not willing to speak about that at that point."

Tyra Sasita, the conservatorship caseworker assigned over all of the cases connected to J.J. and her family members, testified that when she first met with J.J., J.J. had the demeanor of an abused child. She was withdrawn with little or no eye contact. Sasita confirmed that J.J. would not talk with anyone and was "very, very shy" at first. Sasita testified that her intent was to build J.J.'s trust and to explain to her that none of it was her fault. J.J. eventually acknowledged not only that she had been abused but also that all of the children in the home had been abused by K.M.

Sasita explained that working with abused children gets more difficult as they get older. For a teenager, a pattern of behavior has set in, and "[t]hey don't really know that this chaotic environment that they're living in is not . . . what we would think of [as] normal." The issue here is why the Department removed J.J.'s children based upon the information available to it at the time, and there is no evidence that the Department considered any lack of expression of concern by J.J. for her children in the sexually abusive environment of her home as neglectful supervision by her but, rather, as a sexual abuse victim's initial unwillingness to talk openly about her experience and concerns, particularly regarding incest.

Citing Sasita's testimony, the majority seems to imply that J.J. was neglectful because she had options she should have exercised to protect her

6

children from the risk and environment in the household of sexual abuse. But Sasita emphatically testified to the contrary:

Q. Okay. How does a 13-year-old protect against sexual abuse?

A. In terms of -- she's a child -- I mean, that's a child. The child is not supposed to. It's a parent's job to protect.

Q. All right. I agree with you. So in terms of, would you think it's very difficult for a 13-year-old to protect herself against sexual abuse?

A. Yes, I would agree.

Q. Do you think it would be difficult for a 14-year-old to protect herself against sexual abuse?

A. Yes.

Q. And a 15-year-old?

A. Yes.

Q. And a 16-year-old?

A. Yes.

Q. In the situation where a 13-year-old might have a child, what avenues are available for her to move her children outside of the home she's in that you're aware of?

A. There are several. There are several different things that could have happened. I'm cautious to say, because I don't believe it's ever a child's fault, so if you choose not to take any avenue, there are things, there are places out there, yes, but I'm not going to mandate that a child do that. Maybe she didn't know to do that.

Q. It's a difficult situation.

A. Very.

7

Q. This is a hard case.

A. It is.

Hobbs also confirmed that although the Department had concerns that J.J.'s children were at risk of sexual abuse, it was not the Department's position that J.J. should have left the home or that she was not protective of her children. Hobbs testified,

> No, that was our -- no. [J.J.] in my opinion is a victim of sexual abuse. Our concern was that [J.J.'s children] were at risk because they were in the same situation that she was in. . . . [O]ur concern was that these children were at risk of sexual abuse just like [J.J.] had been sexually abused, [M.J.] had been sexually abused, [the twin cousins], all by [K.M.] in the home.

Based upon the foregoing portions of the record as well as J.J.'s own testimony that it was very hard for her to talk about the abuse that had happened in her home because of her feelings of shame and guilt and her belief that it was all somehow her fault, there is no basis in the record that removal of J.J.'s children by the Department was for "abuse or neglect" by J.J.

On appeal, J.J.'s contention is that there was no evidence that her children were removed as the result of *any actual* abuse or neglect but solely due to "risk" of abuse or neglect, which some courts have held to be insufficient for termination of a parent's rights under subsection (O). She points to Hobbs's testimony, as quoted above, that her children were removed because they were at risk of sexual abuse. This court has previously held that evidence was sufficient to establish removal for "abuse or neglect" based upon a CPS

8

investigator's personal knowledge of facts that would lead a person of ordinary prudence to believe that there is "an immediate danger to the physical health or safety of the child" as required for removal without a court order under family code section 262.104(a)(1), (2). *In re M.L.J.*, No. 02-07-00178-CV, 2008 WL 1932076, at *6 (Tex. App.—Fort Worth May 1, 2008, pet. denied) (mem. op.); *see* Tex. Fam. Code Ann. § 262.104(a)(1), (2); *see also S.N.*, 287 S.W.3d at 190 & n.2 (holding family service plan received in evidence without objection contained sufficient factual recitations to support removal for "neglect" in that police arrested mother for abandonment when children were left alone for over twelve hours in filthy house, and court's temporary order naming Department as managing conservator found danger to children's health or safety and "substantial risk of continuing danger if the children are returned home"); *In re A.A.A.*, 265 S.W.3d 507, 510, 515–16 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (op. on reh'g) (finding child was removed for abuse or neglect by mother, not because she left child in shelter while she went to shoplift medicine from store but because she made no effort to determine child's location or condition after being released from police custody, and trial court's temporary order naming Department likewise found a "continuing danger to the physical health or safety of the child if returned to the parent").

The line of cases relied upon by J.J. holding that removal of children based on mere risk of abuse or neglect is insufficient for termination based on violation of subsection (O) are factually distinguishable, as each case involved either

remote prior conduct of a parent concerning different children or a single incident regarding a sibling without evidence of an ongoing threat of abuse or neglect to the child in question at the time of removal. *See In re S.A.P.*, 169 S.W.3d 685, 696–97, 704–06 (Tex. App.—Waco 2005, no pet.) (holding evidence did not establish abuse or neglect under (O) where child was removed from mother three days after birth solely based on remote prior history that parents had rights to other children terminated; caseworker testified that child was not removed for abuse or neglect but only because of prior history, and there was no evidence the prior conduct created any future threat); *see also In re E.C.R.*, No. 01-11-00791-CV, 2012 WL 897777, at *1, 4–6 (Tex. App.—Houston [1st Dist.] Mar. 15, 2012, no pet.) (holding evidence legally insufficient for termination under (O) as to child removed due to "risk" based on incident in which witness claimed mother dragged a sibling down a street by her ponytail causing bruises and scrapes and evidence child was behind on immunizations); *Mann v. Dep't of Family & Protective Servs.*, No. 01-08-01004-CV, 2009 WL 2961396, at *7 (Tex. App.—Houston [1st Dist.] Sept. 17, 2009, no pet.) (mem. op.) (holding evidence insufficient under (O) where child was removed a few days after birth based solely on risk of abuse because a sibling was in the care of the Department based on allegations of physical abuse).

Here, the evidence was undisputed that J.J., her two children, her sister, and her twin cousins were all removed and placed in separate foster homes because of longstanding and ongoing sexual abuse by K.M. of J.J., M.J., and

other children in the household and because of C.J.'s neglectful supervision of all of the children. Therefore, rather than holding as the majority does that the children were removed because of J.J.'s neglectful supervision, I would overrule J.J.'s sole issue because the evidence was clear and convincing that J.J.'s children were removed from the parent under chapter 262 for neglectful supervision by C.J.

ANNE GARDNER
JUSTICE

DELIVERED: February 7, 2013

11